**Carl D. LANDON, Appellant,**

v.

**S & H MARKETING GROUP, INC. and Direct Merchandising, Inc., Appellees.**

**No. 11–00–00249–CV.**

Court of Appeals of Texas, Eastland.

June 13, 2002.

Rehearing Overruled Sept. 12, 2002.

Daniel B. Chern, G. Dennis Sullivan, Sullivan Ave & Holston, Mark M. Donheiser, Mathis & Donheiser, Dallas, for appellant.

Donald E. Uloth, Uloth & Peavler, L.L.P., Clint Schumacher, Kirsten Castaneda, Locke Liddell & Sapp, Dallas, for appellees.

Panel consists of ARNOT, C.J., and WRIGHT, J., and McCALL, J.

### Opinion

W.G. ARNOT, III, Chief Justice.

This appeal involves disputes dating back several years between some affiliated corporations and their former president. Carl D. Landon is the former president of S & H Marketing Group, Inc. (S & H), and Direct Merchandising, Inc. (DMI). S & H and DMI were direct mail marketing businesses affiliated by common ownership operating out of the same facility located in Dallas. S & H and DMI were acquired in 1984 by Hamilton Farrar Richardson, a New York investor. Richardson formed NCF, Inc. (NCF) as a holding company to purchase S & H and DMI. As a result of the purchase, NCF owned all of the stock of S & H and DMI. Richardson owned the majority of the stock of NCF.

Landon was an employee of S & H and DMI at the time of the 1984 purchase. He served as the president of S & H and DMI from 1987 to 1996. He also served on the board of directors of S & H and DMI during this period.[1] From 1987 until January 1995, Richardson and Landon were the only directors of S & H and DMI. Landon controlled the companies' day-to-day operations during this period. Richardson described his role as that of a passive investor. The record reflects that Richardson rarely traveled to Dallas to oversee the companies and that he had placed control of the companies in Landon's hands.

Harvey J. Lippman and Michael Joseph Sullivan, two associates working in Richardson's New York office, became involved with the companies in 1994 at Richardson's request. Richardson sought their involvement because of his concern over the companies' declining revenue. Lippman and Sullivan initially served as consultants to Richardson with respect to the companies' operations. They became directors of the companies in January of 1995. As of January 1996, Lippman had become active in

---

1. Landon served on the board of directors of NCF from 1987 to 1989.

participating in the day-to-day operations of the companies. Lippman, Sullivan, and Richardson eventually grew dissatisfied with Landon's performance as president of the companies. They ultimately decided to terminate Landon in April 1996. Lippman subsequently obtained ownership of S & H and DMI after he foreclosed upon the stock of the companies. The companies' stock had been pledged as security to him for a loan that he made to NCF in 1992.

Landon initiated this litigation in July 1996 by filing suit against Lippman, S & H, and DMI to collect on a $100,000.00 loan that he had purportedly made to the companies in 1995. Landon also sought damages for personal property that he asserted had been converted by Lippman and the companies. Landon additionally sought reimbursement for expenses which he alleged had been incurred on behalf of the companies. S & H and DMI filed a counterclaim against Landon in September 1996 which sought to set aside several transactions between Landon and the companies dating back to 1986 on the basis that Landon had breached his fiduciary duty as an officer and director of the companies.[2] Most of the challenged transactions concerned situations wherein Landon was personally involved on both sides of a particular transaction in both his individual capacity and in his capacity as an officer and director of the companies. For example, S & H and DMI challenged bonuses of several thousand dollars paid by Landon as the president of the companies to himself. S & H and DMI also asserted that Landon had inappropriately usurped corporate opportunities for his own personal benefit.

The parties tried the matter to the trial court over several non-consecutive days.

Neither side was entirely successful in prosecuting their claims for affirmative relief. Both sides have appealed the trial court's judgment. We modify the trial court's judgment in part, affirm in part, reverse and render in part, and reverse and remand in part.

### The Duty Owed by a Corporate Officer/Director

We begin our analysis by discussing the duty owed by a corporate officer/director to the corporation. The Texas Supreme Court in *International Bankers Life Insurance Company v. Holloway,* 368 S.W.2d 567 (Tex.1963), noted that corporate officers and directors owe a strict fiduciary obligation to their corporation. Three broad duties stem from the fiduciary status of corporate officers and directors: namely the duties of obedience, loyalty, and due care. *Gearhart Industries, Inc. v. Smith International, Inc.,* 741 F.2d 707, 719 (5th Cir.1984)(addressing Texas law); see *General Dynamics v. Torres,* 915 S.W.2d 45, 49 (Tex.App.-El Paso 1995, writ den'd). This case concerns the duty of loyalty which Landon owed to the corporations. The duty of loyalty dictates that a corporate officer or director must act in good faith and must not allow his or her personal interest to prevail over the interest of the corporation. The duty of loyalty requires an extreme measure of candor, unselfishness, and good faith on the part of the officer or director. *International Bankers Life Insurance Company v. Holloway,* supra at 577. Under common law, contracts between a corporation and its officers or directors are voidable for unfairness and fraud. *International Bankers Life Insurance Company v. Holloway,* supra at 576. A corporate fiduciary

---

**2.** All claims which NCF could have asserted against Landon were assigned to and prose-cuted by DMI.

is under an obligation not to usurp corporate opportunities for personal gain. Transactions in which a corporate fiduciary derives personal profit are subject to the closest examination. *International Bankers Life Insurance Company v. Holloway,* supra at 577.

■■■ Whether an officer or director is "interested" with respect to a particular transaction is a question of fact. *International Bankers Life Insurance Company v. Holloway,* supra at 577; *Gearhart Industries, Inc. v. Smith International, Inc.,* supra at 719. An officer or director is considered "interested" if he: (1) makes a personal profit from a transaction by dealing with the corporation or usurps a corporate opportunity; (2) buys or sells assets of a corporation; (3) transacts business in his officer's or director's capacity with a second corporation of which he is also an officer or director or is significantly financially associated; or (4) transacts business in his officer's or director's capacity with a family member. *Gearhart Industries, Inc. v. Smith International, Inc.,* supra at 719–20. The burden of proof is on the interested officer or director to show that the action under consideration is fair to the corporation. *International Bankers Life Insurance Company v. Holloway,* supra at 576; *Gearhart Industries, Inc. v. Smith International, Inc.,* supra at 720.

### "Interested Director" Legislation

It should be noted that the Texas Legislature has enacted legislation with respect to interested director transactions. TEX. BUS. CORP. ACT ANN. art. 2.35–1 (Vernon Supp.2002) provides three methods whereby an interested director's contract or transaction can be validated:

1. Upon the affirmative, good faith vote of a majority of disinterested directors provided that the material facts of the contract or transaction is disclosed to or known by the board;

2. Upon the affirmative, good faith vote of the shareholders provided that the material facts of the contract or transaction is disclosed to or known by the shareholders; or

3. The contract or transaction is fair as to the corporation as of the time that it is authorized, approved, or ratified by the board of directors or shareholders.

It appears that this statute alters common law with respect to the requirement that the director prove that the contract or transaction is fair to the corporation for every challenged transaction. Only one of the validation methods listed in the statute requires a showing of fairness. The other two methods—disinterested director approval and shareholder approval—do not explicitly require a showing of fairness. The statute lists the three validation methods disjunctively. Furthermore, the statute explicitly states that compliance with any one of the methods is sufficient. With these principles in mind, we address the contracts and transactions which have been challenged in this proceeding.

### Bonuses

The trial court's findings of fact regarding the bonuses which Landon received from the companies state as follows:

Between 1987 and 1992, Landon received bonuses from NCF, Inc., S & H, and [Response Marketing, Inc.[3]]. The following bonuses

---

3. Response Marketing, Inc. (RMI) was another direct mail marketing business which NCF acquired after S & H and DMI were purchased. RMI was operated as a sister company to S & H and DMI. Landon served as the president of RMI, and he and Richardson comprised the membership of its board of directors. RMI's claims against Landon were assigned to DMI.

| | |
|---|---|
| $ 80,000 | 8/14/86 |
| $150,000 | 1/12/89 |
| $275,000 | 7/17/89 |
| $100,000 | 12/17/90 |

were reported in various companies' audited or unaudited financial statements and/or consolidated tax returns of NCF, Inc. Mr. Richardson as director and majority shareholder of NCF, Inc. knew or should have known of Landon's actions. Furthermore, Landon's bonuses were authorized by Mr. Richardson. Landon did not breach his fiduciary duty as it relates to these bonuses and any claims against Landon regarding these bonuses are barred by the applicable Statute of Limitations.

The $40,000 bonus paid by RMI in March of 1992, however, was not authorized or ratified. Furthermore, Mr. Richardson did not know or ever had reason to know of the payment. Landon is liable to DMI (RMI assigned its claim) for the $40,000.

Thus, with the exception of the $40,000.00 bonus paid by RMI in March of 1992, the trial court found that S & H and DMI's claims regarding bonuses were barred by the applicable statute of limitations. Furthermore, the trial court denied S & H and DMI's claim that Landon breached his fiduciary duty in receiving these bonuses.

S & H and DMI attack the trial court's finding regarding the expiration of the statute of limitations as to the bonuses in their Appellate Issue No. 12(a). They assert that the trial court erred in denying their claims on limitation grounds based on the finding that Richardson knew or should have known of these payments to Landon. Citing *Willis v. Maverick*, 760 S.W.2d 642, 646 (Tex.1988), S & H and DMI argue that their causes of action concerning the bonuses constituted claims for breach of fiduciary duty which did not

accrue until there had been full disclosure by Landon of the bonuses. They contend that Landon fraudulently concealed the bonuses that he had received and that the applicable limitation periods were, therefore, tolled.

The supreme court held in *Willis* that the discovery rule applies to legal malpractice cases. The court determined that the statute of limitations does not begin to run until the claimant discovers or should have discovered through the exercise of reasonable care and diligence the facts establishing the elements of his cause of action. *Little v. Smith*, 943 S.W.2d 414, 420 (Tex.1997)("Similarly, when there has been a breach of fiduciary duty, the statute of limitations does not begin to run until the claimant knew or should have known of facts that in the exercise of reasonable diligence would have led to the discovery of the wrongful act.")

▮▮▮ The trial court made a finding which comports with the "knew or should have known" framework adopted by the supreme court. S & H and DMI are essentially attacking the sufficiency of the evidence supporting this finding. The standards that apply to a review of jury findings also apply to findings made by the trial court after a bench trial. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.1994). As claimants, S & H and DMI had the burden of pleading and proving facts suspending the operation of the statute of limitations. See *Willis v. Maverick*, supra at 647. When a party attacks the legal sufficiency of an adverse finding on an issue on which he has the burden of proof, he must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chemical Company v. Francis*, 46 S.W.3d 237, 241 (Tex.2001).[4] To review the legal

---

4. The supreme court in *Dow Chemical Com-* *pany* cited *Sterner v. Marathon Oil Company,*

sufficiency of the evidence, the appellate court must consider all the evidence in the light most favorable to the prevailing party and must indulge every reasonable inference in favor of the prevailing party. *Associated Indemnity Corporation v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285–86 (Tex.1998); *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997), *cert. den'd*, 523 U.S. 1119, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998); *Harbin v. Seale*, 461 S.W.2d 591, 592 (Tex. 1970).

In order to determine if the evidence is factually sufficient, we must review all of the evidence and determine whether the challenged finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pool v. Ford Motor Company*, 715 S.W.2d 629 (Tex.1986).

We find that the trial court's "knew or should have known" finding was

767 S.W.2d 686 (Tex.1989), in commenting on the standard of review for a "matter of law" challenge. We note that *Sterner* and *Holley v. Watts*, 629 S.W.2d 694 (Tex.1982), are often cited for the proposition that a "matter of law" challenge requires a two-step analysis of the evidence. The first step requires a review of the record to find evidence which supports the fact finder's failure to make the affirmative finding sought by the claimant. If there is no evidence to support the fact finder's "no" finding, the second step requires an examination to see if the contrary proposition, i.e. the affirmative finding which the claimant sought to obtain, is established as a matter of law. We believe that *Sterner's* and *Holley's* formulation of the applicable standard of review is both illogical and incorrect. The problem with their standard was addressed by the El Paso Court of Appeals in *Montes v. Texas Employers' Insurance Association*, 779 S.W.2d 485, 487 (Tex.App.-El Paso 1989, writ den'd), wherein the court stated:

We respectfully question that analysis of the issue because in applying the first half of that rule, it must be recognized that no

supported by both legal and factually sufficient evidence. Landon testified that he obtained Richardson's oral authorization for each of the bonuses. It was within the province of the trial court to accept this testimony as being credible. Moreover, excerpts from a deposition taken in March 1993 of Richardson in another lawsuit were admitted into evidence. The deposition was taken by a creditor of the companies who was seeking information from Richardson regarding the companies' finances. Richardson was asked several questions concerning Landon's compensation during the deposition, including bonuses that he had received. Richardson's responses to these questions indicated his awareness in 1993 that Landon had received large bonuses from the companies:

Q: How much does [Landon] get paid, do you know?

A: I do not know the exact amount at this time, no. It's over a $100,000 a year.

evidence is required to support a "no" answer, which only means that the party with the burden of proof failed to carry that burden. If that be so, and it clearly is, then a reviewing court would never get to the second hurdle. In addition, we note that the "no" answer is not a finding of the opposite of the issue inquired about. If there is no finding of the "opposite" how does a court determine if there is some evidence to support the finding? No finding has been made. We conclude there is only one hurdle. Does a review of the entire record establish the proposition as a matter of law? If that question is answered in the affirmative, it must necessarily mean that the jury answer was wrong and the jury could not legally have answered the question in the negative.

If there is any evidence to the contrary, the issue ·has not been established as a matter of law. (Citations omitted)

We believe that *Montes'* criticism of *Sterner* and *Holley* is well-founded. Furthermore, we enthusiastically support the supreme court's tacit abandonment of the two-step analysis in *Dow Chemical Company*.

Q: Over [$200,000]?

A: No.

Q: No?

A: No. Again, I do not think over [$200,000] in salary. In some years there have [been] bonuses I'm sure that have been over [$200,000]. To the best of my knowledge, the salary of [Landon] is not over $200,000 a year. Occasionally there have been bonuses granted at different times where the total amount of compensation would be over $200,000—over 200,000.

\* \* \*

Q: Would it be a fair statement then the company could not afford to bonus Mr. Landon $130,000 in the month of June 1992?

A: If the company paid him a bonus of $130,000 in June of 1992, I presume we could afford to do it and it was deserved.

\* \* \*

Q: Do you know whether Mr. Landon got a bonus in June of 1992?

A: I'm sure I knew at the time that Mr. Landon got a bonus, yes. . . . Again, Mr. Landon runs the company and he has my confidence. Mr. Landon signs all the checks. . . . If you're telling me that the checks were written and was written as a bonus then, yes, I am comfortable that he does it. [Landon]— and I told you previously, [Landon] runs the business. We talk on the phone sometimes three or four times a week, sometimes once a week, sometimes we're not—perhaps three weeks. And the decisions of running the business are [Landon's]. . . . Before paying himself a

bonus, I am confident that Mr. Landon would discuss it with me.

At a minimum, the matters covered in Richardson's deposition constituted a sufficient disclosure of facts that, in the exercise of reasonable diligence, would have led him, as a director, to the discovery of any breaches of fiduciary duty allegedly perpetrated by Landon with respect to receiving bonuses. Notice to an officer or agent is notice to corporation in the circumstance where the officer or agent in the line of his duty ought, and reasonably be expected, to act upon or communicate the knowledge to the corporation. *International Bankers Life Insurance Company v. Holloway,* supra at 577. Notice to a corporation sufficient to activate the statute of limitations is not categorically limited to that acquired by directors in official meetings. *Id.* As noted by the supreme court in *Holloway:*

> The office of a corporation director or officer is more than nominal, and those assuming the duties and responsibilities of such offices are not justified in neglecting every precaution or investigation; it is their minimal duty and responsibility to protect the corporation against acts adverse to the interest of the corporation, whether perpetrated by fellow directors or by strangers.

*International Bankers Life Insurance Company v. Holloway,* supra at 580. Accordingly, S & H and DMI's Appellate Issue No. 12(a) is overruled.[5]

S & H and DMI's Appellate Issues Nos. 7(a) through 7(e) attack the legal and factual sufficiency of the evidence regarding the trial court's failure to award a recovery of each of the bonuses purportedly received by Landon. The trial court's finding that S & H and DMI's claims for these

---

**5.** S & H and DMI's Appellate Issue No. 12(b) addresses the trial court's failure to enter findings to the effect that the statute of limitations were tolled on other claims they assert-

ed. The trial court did not deny these other claims on limitations grounds. Accordingly, we do not address Appellate Issue No. 12(b) because it is moot.

recoveries was barred by the applicable statute of limitations is dispositive of S & H and DMI's bonus claims. We, therefore, do not address Appellate Issues Nos. 7(a) through 7(e) because they are moot. TEX.R.APP.P. 47.1.

 Landon attacks the trial court's award of a recovery to DMI for the $40,000.00 bonus he received in 1992 from RMI. The trial court found that this bonus was neither authorized nor ratified. Landon essentially attacks the factual sufficiency of the evidence regarding this finding in his Appellate Issue No. 2 by arguing that evidence of authorization was offered at trial. We would first note that Landon bore the burden of proof with regard to the issue of authorization because his receipt of the bonus constituted an interested director/officer transaction. See *Gearhart Industries, Inc. v. Smith International, Inc.*, supra at 719–20. We find ample evidence in the record which supports the trial court's refusal to find authorization for this bonus. Richardson testified that he did not recall approving this bonus. Landon prepared an internal document entitled "authorization for payment by check" for the $40,000.00 bonus. This document indicated that only Landon had approved the payment. The "authorization for payment by check" forms which Landon prepared for the other bonuses indicated that Richardson had approved the payment. Additionally, Landon stated in his answer to an interrogatory propounded by the Internal Revenue Service in 1995 that RMI had not paid compensation to any officer, director, or shareholder since its inception. This answer constitutes evidence of non-disclosure and, hence, non-authorization of the $40,000.00 bonus. Landon's Appellate Issue No. 2 is overruled.

## Grand Prairie Property

In 1985, DMI purchased a tract of land in Grand Prairie for $715,000.00 for the purpose of future relocation of the companies' facilities. The tract was never used for relocation. As of 1989, the value of the tract had decreased significantly. Landon suggested to Richardson that the land could be sold for a loss to offset a large taxable capital gain which NCF had realized on a sale of corporate stock. Landon purchased the land in his individual capacity for a price of $300,000.00. He made a down payment of $25,000.00, and he executed a real estate lien note in favor of DMI in the amount of $275,000.00. Landon only made two subsequent payments on the note. In 1993, he forwarded a modification agreement to Richardson and Lippman [6] which would have removed Landon's personal liability for the real estate lien note by allowing him to tender the tract back to DMI in full satisfaction of the note. Landon requested that Richardson and Lippman execute the modification agreement, but they refused. Landon replaced the space for Richardson's and Lippman's signatures on the modification agreement with a place for his own signature. Landon then executed the modification agreement as the president of DMI.

DMI began efforts to collect the real estate lien note against Landon in 1996. DMI instituted foreclosure proceedings against the property when Landon did not pay the deficiency on the note. DMI alleged a deficiency in the amount of $497,027.11 (exclusive of attorneys' fees) on the note at the time it was presented to DMI's attorneys for collection. Landon purchased the property at the foreclosure sale for the price of $408,500.00. He subsequently sold the property for approximately $475,000.00. The trial court award-

---

**6.** As of 1993, Lippman possessed the voting rights of the entire stock of DMI.

ed judgment to DMI for $36,585.40 with respect to the Grand Prairie property based on the following fact finding:

> Landon purchased a piece of property in Grand Prairie from DMI for $275,000 and signed a real estate lien note. On November 15, 1993, Landon and DMI entered into an agreement removing Landon's personal liability under the real estate lien note. Under the terms of the real estate note, Mr. Landon was to execute a deed in lieu of foreclosure and DMI was to look solely to the property to pay the debt. Mr. Landon sold the property for over $470,000 and has paid $408,500 to DMI. Mr. Landon owes DMI the difference between the actual sales price and the $408,500.

S & H and DMI's Appellate Issue No. 1 attacks the legal and factual sufficiency of the evidence to support the trial court's finding of a valid modification of the real estate lien note. Landon executed the modification agreement referenced above on November 15, 1993. The trial court, therefore, determined that Landon's execution of the modification agreement bound DMI to its terms. The real estate lien note which Landon executed in 1989 did not eliminate Landon's personal liability for the debt. Despite this omission, Landon contends that an oral agreement existed between he and Richardson to the effect that Landon would not be personally liable for the note. Landon, therefore, argues that the modification agreement was authorized because it memorialized the terms of his original agreement with Richardson. He further contends that the modification agreement was fair to DMI based on the fairness of the original agreement.

■ The trial court's findings of fact regarding the modification agreement did not address any of the elements of Article 2.35–1 of the Texas Business Corporation Act.[7] S & H and DMI filed requests for additional findings of fact pertaining to the elements of Article 2.35–1. However, the appellate record does not indicate that any additional findings were made. The trial court did not make a finding of fairness with respect to any of the challenged transactions. The only finding regarding authorization made by the trial court concerned its finding that the $40,000.00 bonus which Landon received from RMI in 1992 was not authorized. Even if one assumes that the trial court made an implied finding of authorization or fairness, we do not find sufficient evidence to support the determination that the modification agreement was valid.

■ With respect to authorization, there is no dispute that Richardson and Lippman refused to execute the modification agreement. Landon overcame this obstacle by changing the signature lines on the document and by executing the agreement himself in his corporate capacity. As for Landon's theory that the modification agreement only reflected the alleged original agreement that he not be personally liable on the note, the trial court did not make this finding. Moreover, even for a determination of fairness to be made under Article 2.35–1(A)(3), approval by the board of directors or shareholders is required. While evidence of the fairness of the original conveyance to Landon was offered, there is no evidence of fairness pertaining to the execution of the modification agreement. The modification agreement reduced the sums to which DMI

---

7. Landon argues that his execution of the modification agreement did not constitute an interested transaction. Given the fact that Landon's execution of the modification agree-ment eliminated his personal liability on the real estate lien note, we disagree with his assertion.

would be entitled to collect on the note without any corresponding consideration flowing to DMI for the reduction.

We, therefore, sustain S & H and DMI's Appellate Issue No. 1. The trial court's determination that the modification agreement was valid is reversed and rendered in favor of DMI. DMI's claim against Landon on the real estate lien note is remanded to the trial court for determination of Landon's liability and DMI's corresponding damages. We would note in this regard that the trial court has not made a determination as to the amount of the deficiency remaining on the note. We do not address S & H and DMI's Appellate Issues Nos. 2 and 3 complaining of the damages awarded by the trial court to DMI because the award has been remanded for determination consistent with our opinion. We also do not address Landon's Appellate Issue No. 3 because it attacks the damage award made by the trial court which we are remanding.

### United Medicorp Note

S & H and DMI's Appellate Issues Nos. 4, 5, and 6 attack the trial court's denial of their claim involving a $70,000.00 loan made to Landon. The trial court's findings of fact on this claim are as follows:

> On December 1, 1989 Landon borrowed $70,000 from DMI for the purpose of buying shares of United Medicorp, Inc. stock and signed a promissory note to DMI for $70,000. The note contained a "put back" provision that allowed Landon to satisfy the debt by tendering back the United Medicorp, Inc. stock. In 1992, Landon tendered his shares of United Medicorp, Inc. back

to DMI in accordance with the note provision. The note [provision] has been paid in full.

S & H and DMI primarily complain of the note's inclusion of the "put back" provision and Landon's exercise of the provision. Landon testified that Richardson proposed a transaction whereby the companies would invest in United Medicorp (UMC) stock by and through their directors. DMI loaned Richardson $280,000.00 and Landon $70,000.00 to purchase UMC stock. Landon testified that his note was identical to Richardson's note in that both notes contained the same "put back" provision.[8] The "put back" provision reads as follows: "Lender further agrees to accept this pledged security as full and complete payment of this note."[9] The note required payment to be made on or before December 31, 1991. Landon made a voluntary partial payment on the note in the amount of $27,369.36 in December 1990. This payment was made at a time when the value of UMC stock exceeded the amount at which Landon had purchased the stock. Landon did not make any future payments on the note. Instead, he tendered his shares of the stock to DMI in March of 1992.[10] He also obtained a reimbursement of the $27,369.36 which he had previously paid on the note.

 S & H and DMI complain of the legal and factual sufficiency of the evidence supporting judgment in Landon's favor on the UMC note in Appellate Issue No. 4. Landon asserts that the "put back" provision was authorized based on the purported terms of Richardson's note and on Richardson's oral authorization of same.

---

8. Richardson's note was not offered into evidence.

9. Even though the note purports to contain a provision binding DMI, no one executed the note on behalf of DMI.

10. The UMC stock was worth less than $10,000.00 when Landon tendered it to DMI.

Landon's authorization argument requires us to consider the elements required to obtain a finding of authorization under Article 2.35–1(A)(2). S & H and DMI argue that, unless an actual vote of the board of directors is taken, Article 2.35–1(A)(2) cannot be invoked to avoid the requirement of showing fairness. Article 2.35–1(A)(2) uses the words "vote" and "quorum" to describe the actions required of the disinterested directors. These words indicate that the statute requires formal board approval in order to comply with the statute as opposed to Richardson's informal approval. Moreover, the statute requires a showing that the disinterested directors acted in good faith in approving the transaction. There is no evidence to the effect that Richardson acted in good faith in approving the "put back" provision. With respect to the fairness of the "put back" provision, DMI assumed all risks in the event the value of the stock dropped. If the stock had risen in value, Landon would have obtained all of the profit from the transaction. We, therefore, find no evidence supporting the trial court's ruling upholding the "put back" provision. The trial court's denial of DMI's claim on the note is reversed and remanded for a determination of the damages which DMI is entitled to recover on said claim. We do not address S & H and DMI's Appellate Issues Nos. 5 & 6 because they concern arguments presented in the alternative to their Appellate Issue No. 4.

### Jack Young Note

S & H and DMI's Appellate Issues Nos. 8(a) and 8(b) concern a transaction referred to by the parties as the "Jack Young Note." The trial court entered the following fact finding regarding the Jack Young Note:

On April 3, 1981, Jack Young sold his shares of NCF, Inc. stock back to NCF, Inc. in exchange for a $105,000 note. NCF also loaned Young $16,000. The note provided that NCF could offset the $16,000 from its payment due to Young. NCF paid $25,000 to Young, leaving a balance on the note of $80,000 that could be offset by the $16,000. In August 1981, Landon structured a deal with Young whereby the amount owing on the note from NCF to Young would be postponed for four years and NCF would deposit funds into an interest-bearing account pending resolution of various printing bills. On March 3, 1989, NCF loaned Young an additional $20,000 that likewise could be used to offset the $80,000 NCF owed Young. In 1989 Landon purchased Young's note.

On March 23, 1992, Landon withdrew the funds earmarked for payment of the NCF note to Young. The funds totaled $111,595.93. Landon received the monies as payment on the $80,000 note he had purchased from Young plus $31,595.93 of interest. NCF was entitled to offsets of $16,000 and $20,000 which had not been repaid. NCF was damaged in the amount of $36,000 on March 23, 1992, by not being afforded the opportunity to offset the amount due it by Young plus an additional amount of $14,218.17 in interest.[11]

Young was a minority shareholder of NCF who also worked as a printing broker. Young contracted with third-party printers to produce the companies' mailings. As noted in the trial court's fact finding, Young agreed to sell his stock in NCF for the total sum of $105,000.00. NCF paid

---

**11.** The trial court's references to 1981 are erroneous. The Jack Young Note was execut- ed in 1987.

Young $25,000.00 in cash and executed a note in his favor in the amount of $80,000.00 for a total consideration of $105,000.00. However, NCF also loaned Young $16,000.00 at this time with the intent of offsetting the $16,000.00 against NCF's indebtedness on the $80,000.00 note. NCF subsequently loaned Young an additional $20,000.00 also with the intent of offsetting this $20,000.00 against NCF's indebtedness on the $80,000.00 loan.

Sometime after the original agreement with Young was entered, it was discovered that Young had not paid some of the printers who had been retained to do printing for the companies even though the companies had forwarded funds to Young for this purpose. The concern arose that the printers would look to the companies for payment. Landon felt that it would be improper to pay Young's note if Young had exposed the companies to liability by failing to pay the printers. Accordingly, an agreement was reached whereby the maturity date of the note to Young would be extended for four years to provide for the expiration of the statute of limitations for the printers' potential claims for payment. Funds were placed in an escrow account at that time sufficient to pay the $80,000 indebtedness to Young. Landon subsequently purchased the $80,000.00 note in favor of Young. Landon purchased the note in his individual capacity. S & H and DMI contend that Landon's purchase of the note in his individual capacity constituted the usurpation of a corporate opportunity.

 To establish a breach of fiduciary duty by usurping a corporate opportunity, the corporation must prove that an officer or director misappropriated a business opportunity that properly belongs to the corporation. *International Bankers*

*Life Insurance Company v. Holloway,* supra at 576–78; *Icom Systems, Inc. v. Davies,* 990 S.W.2d 408, 410 (Tex.App.-Texarkana 1999, no writ). The business opportunity arises where a corporation has a legitimate interest or expectancy in and the financial resources to take advantage of a particular business opportunity. *Icom Systems, Inc. v. Davies,* supra at 410. A corporation's financial inability to take advantage of a corporate opportunity is one of the defenses which may be asserted in a suit involving an alleged appropriation of a corporate opportunity. *Canion v. Texas Cycle Supply, Inc.,* 537 S.W.2d 510, 513 (Tex.Civ.App.-Austin 1976, writ ref'd n.r.e.). A corporation's abandonment of a business opportunity is another defense to a suit alleging usurpation of a corporate opportunity. See *Huffington v. Upchurch,* 532 S.W.2d 576 (Tex.1976). The burden of pleading and proving corporate abandonment and corporate inability is placed upon the officer or director who allegedly appropriated the corporate opportunity. *Huffington v. Upchurch,* supra at 579; *Canion v. Texas Cycle Supply, Inc.,* supra at 513.

 In Appellate Issues Nos. 8(a) and 8(b), S & H and DMI attack the trial court's determination that Landon's acquisition of the Jack Young Note was valid. The opportunity to extinguish a corporation's indebtedness to a creditor clearly constitutes a business opportunity in which the corporation had a legitimate interest or expectancy. Landon urges on appeal that Young presented this corporate opportunity to the companies but that the companies chose not to take advantage of this opportunity.[12] Evidence was offered that Young presented an offer to the companies to sell stock that he owned in another corporation and the $80,000.00 note in his favor as a package. However, the trial

12. Landon did not plead abandonment in the trial court.

court did not find that the companies abandoned the opportunity to re-acquire the Jack Young Note. Consequently, the trial court did not make a finding in support of Landon's affirmative defense of abandonment. The trial court's judgment that Landon validly acquired the Jack Young Note is, therefore, not supported by the court's findings of fact. This portion of the trial court's judgment is reversed and rendered in favor of S & H and DMI. Given the fact that Landon purchased the Jack Young Note in a package with Young's stock in a company, a determination of the amount which Landon paid for the Jack Young Note is necessary. DMI's claim regarding the Jack Young Note is, therefore, remanded for this determination. DMI is entitled to judgment against Landon for $111,595.93 less the amount which Landon paid for the Jack Young Note. DMI is also entitled to prejudgment interest measured from March 23, 1992.

Landon attacks the trial court's determination that DMI was entitled to offsets in the amount of $16,000.00 and $20,000.00 in Appellate Issue No. 1. The trial court specifically found that the loans to Young had not been paid. Landon attacks the evidence supporting this finding by arguing that no evidence was offered that the loans had not been repaid. Landon testified at the conclusion of the trial that he thought that the loans had been repaid by Young. The resolution of Landon's evidentiary attack depends largely on a determination of which party had the burden of establishing the status of the loans to Young. Landon argues that, since DMI was seeking offsets for the loans, it had the burden of establishing that the loans remained outstanding. We disagree with Landon's contention. DMI claimed that Landon breached his fiduciary duty in his handling of the Jack Young Note. As such, Landon had the burden of proof to

justify his actions with respect to the Jack Young Note. There is no dispute that the sums of $16,000.00 and $20,000.00 were loaned to Young and that these sums could be offset against NCF's $80,000.00 indebtedness to him. Landon, therefore, had the burden of establishing that the $16,000.00 and $20,000.00 had been repaid. While Landon offered testimony that Young had repaid the loans, it was within the province of the trial court to reject this testimony. Landon's Appellate Issue No. 1 is overruled.

## Landon's $100,000.00 Note

In their Appellate Issues Nos. 9(a) and 9(b), S & H and DMI attack the trial court's judgment·in Landon's favor regarding a loan of $100,000.00 that he made to at least one of the companies. The trial court entered the following findings of fact regarding the loan:

On or about September 11, 1995, Carl Landon lent $100,000 to S & H Marketing and DMI pursuant to the terms of a promissory note. On or about December 13, 1995, S & H paid Landon $5,000 as a reduction of principal on the note. The note provided for 18% interest and was due upon demand but not later than December 11, 1995. As of December 13, 1995, $95,000 remained due on the note. Landon is entitled to recover $95,000 plus interest at 18% per annum and reasonable attorney's fees.

The evidence revealed that the loan occurred as a result of a need to pay an invoice for electronic equipment which S & H had ordered. Landon testified that he discussed the companies' inability to pay the invoice with Richardson and that Richardson advised him to find a way to take care of the shortfall. Landon responded by making the $100,000.00 loan from his personal funds. Landon was the only corporate officer to approve the note which

was executed. There is no dispute that Landon made a loan of $100,000.00 to S & H. However, S & H and DMI complain of the interest rate which Landon charged on the loan. DMI additionally asserts that Landon breached his fiduciary duty by including it as a maker on the note.

 Landon testified that he wired $100,000.00 into S & H's operating account to cover the invoice for S & H. Landon unilaterally prepared the note a few days after the loan was made. With respect to the note's interest rate, Landon testified that he "charged them an extremely high interest rate for a—what I thought was going to be a 90–day term note here." He further testified that Richardson and Lippman protested the interest rate as being extremely high. With respect to DMI's inclusion on the note, Landon was asked at trial:

> Q: As I understand it, the money was transferred into the S & H operating account and DMI got none of the proceeds of that loan. Correct?
>
> A: That's correct.

Landon testified that he included DMI as the maker on the note and pledged assets owned by DMI to ensure repayment of his loan. He was concerned about repayment based upon Richardson filing for bankruptcy a few weeks prior to the loan. The trial court did not make any findings that the board authorized the terms of the note or that the note's terms were fair. Even if the trial court had made these findings, there is no evidence in the record to support these findings. Landon's unilateral preparation of the note occurred at a time when the boards of directors of S & H and DMI were comprised of Richardson, Landon, Lippman, and Sullivan. The evidence conclusively establishes that a majority of disinterested directors did not authorize the terms of the note. With respect to fairness, the evidence clearly establishes

that DMI did not receive any proceeds of the loan but, rather, that the loan was used to fund S & H's purchase of inventory. As for the interest rate, Landon testified that the rate was extremely high.

 Landon argues on appeal that Richardson ratified the terms of the loan by not protesting the terms after being advised of same. The trial court did not find that ratification occurred. Furthermore, Richardson did not constitute a majority of disinterested directors, and he did not possess, own, or control the stock of either S & H or DMI at the time the alleged ratification occurred.

 We, therefore, reverse the trial court's judgment against DMI on Landon's $100,000.00 note and render judgment in DMI's favor in that regard. With respect to the interest rate, we reverse the trial court's judgment providing for interest against S & H at the rate of 18 percent per annum. With respect to the further disposition of the interest issue, S & H contends that we should make a usury finding against Landon and impose the penalties set out in the usury statutes. S & H argues that, since the board of directors did not authorize a specified interest rate, Landon was limited to charging the "legal interest rate" set out in TEX. FIN. CODE ANN. § 302.002 (Vernon Supp.2002) of 6 percent for situations wherein no interest rate is agreed upon by the parties. It does not appear that S & H's usury claim was adequately developed in the trial court. We, therefore, remand the interest issue to the trial court for a determination of the interest rate which Landon would be permitted to charge under the fairness requirement for interested officer/director transactions. With respect to S & H's usury claim, we would direct the parties attention to a provision of Landon's note which reads: "Nothing in this note shall authorize the collection of interest in ex-

cess of the highest rate allowed by law." It would appear that this provision constitutes a savings provision which could affect the usury claim.

### Travel Expenses

■ S & H and DMI's Appellate Issue No. 10 addresses a judgment against DMI in the amount of $1,570.00 for the reimbursement of Landon's travel expenses. The trial court found that the expenses were incurred by Landon "on behalf of and for the benefit of S & H and DMI." S & H and DMI do not contest the judgment for travel expenses entered against S & H. However, they contend that there is legally and factually insufficient evidence to support the finding that the expenses were incurred on behalf of DMI. They assert that, since DMI was dormant at the time the travel occurred, the expenses were not incurred for the benefit of DMI. We disagree with S & H and DMI's assertion. While DMI may not have been actively engaged in sending mail solicitations, DMI continued to remain an existing entity operated in conjunction with the other companies. Unlike Landon's loan of $100,000.00 which solely benefitted S & H, the travel expenses are not clearly attributable to a single company. We, therefore, find legally and factually sufficient evidence to support the trial court's determination. S & H and DMI's Appellate Issue No. 10 is overruled.

### UCNWINN Stock

■ In their Appellate Issue No. 11, S & H and DMI attack the legal and factual sufficiency of the trial court's finding that Landon is entitled to keep stock in a company referred to as "UCNWINN." The testimony revealed that NCF owned stock in a company known as "SOK Properties." Landon purchased this stock from NCF in 1992 for $10.00. Landon testified that the stock had little or no value. He further testified that the transfer was made to dispose of NCF's assets in light of a creditor's impending effort to seize its assets. Subsequent to Landon's purchase, SOK was acquired by UCNWINN. S & H and DMI concede that there is some evidence that Landon's purchase was authorized. However, they emphasize that conflicting evidence outweighs the evidence of authorization. We find legally and factually sufficient evidence supporting the trial court's determination that Landon is permitted to keep the UCNWINN stock. The transaction was consistent with other transactions undertaken by NCF to eliminate assets upon which its creditor could execute by judgment. S & H and DMI's Appellate Issue No. 11 is overruled.

### Postage

■ Landon argues in his fourth appellate issue that the evidence either conclusively established his claim to be reimbursed for postage in the amount of $38,560.00 or that the trial court's denial of his claim was against the great weight and preponderance of the evidence. The trial court entered the following finding with respect to this claim:

Landon charged $38,560 for postage on various credit cards. Landon introduced insufficient evidence at trial showing that the postage was used for the benefit of DMI or S & H Marketing. The Court finds therefore that the postage was not used for the benefit of either DMI or S & H Marketing. Neither S & H Marketing or DMI are liable to Landon on his postage claim.

As per the trial court's finding, Landon testified that postage in the amount of $38,560.00 was charged to his credit card on behalf of the companies. Landon bore the burden of proof on this claim for affirmative relief. It was within the province

of the trial court to reject Landon's testimony in support of this claim. Landon's Appellate Issue No. 4 is overruled.

*Phillipsburg Twelve Station Inserter*

■ Landon's Appellate Issue No. 5 concerns the trial court's calculation of damages awarded to Mailmasters, S & H's wholly-owned subsidiary, regarding a piece of mail equipment referred to as a "Phillipsburg Twelve–Station Inserter" which Landon purchased individually and leased to Mailmasters.[13] The trial court's findings regarding this transaction were as follows:

> In October 1988, Landon purchased a Phillipsburg Twelve Station Inserter from Bell & Howell. Mailmasters made a down payment of $9,112. In January 1989, Landon began leasing the Phillipsburg to Mailmasters. The equipment lease required payments through 1993 at which time the lease expired and Mailmasters had an option to purchase the equipment for $10,000. (After offsetting the $9,112 that Mailmasters had paid down, Mailmasters would owe $888 if it chose to exercise the option.) Rather than exercising the option to purchase, Landon instructed Julie Beck to continue making the annual lease payments of $17,661 each or $35,322. Landon is liable to Mailmasters for the $35,322. Additionally, Landon has no possessory or ownership interest in the Phillipsburg Twelve–Station Inserter.

The trial court entered judgment against Landon for the principal amount of $35,322.00. Landon first argues that the amount of $35,322.00 should have been reduced by $888.00 because Mailmasters would have owed this amount under the lease had it exercised the option. We find that Landon's contention is consistent with the trial court's finding that $888 would have been owed.

■ Landon also contends that the trial court incorrectly calculated prejudgment interest on the award of damages regarding the inserter. The trial court's judgment provides that prejudgment interest is to be calculated from the dates of June 30, 1994, and June 30, 1995, for each of the payments of $17,661.00 made by Mailmasters. These payments represented the due dates for future payments under the lease. Landon argues that Mailmasters did not make payments on the dates of June 30, 1994, and June 30, 1995, but, rather, that the payments were made on September 13, 1994, and July 27, 1995, respectively. He, therefore, argues that prejudgment interest should have been calculated from September 13, 1994, and July 27, 1995. Given the fact that Mailmasters had use of the funds until the date the payments were actually made, we find Landon's contention well taken. We, therefore, modify the trial court's judgment awarding Mailmasters $35,322.00 to reflect an award of $34,434.00. We further modify the trial court's calculation of prejudgment interest. Mailmasters is entitled to prejudgment interest on the sum of $16,773.00 measured from September 13, 1994, until March 23, 2000, at the rate of 10 percent. Mailmasters is entitled to prejudgment interest on the sum of $17,661.00 measured from July 27, 1995, until March 23, 2000.

■ Finally, Mailmasters attempts to assert an appellate issue in this proceeding although it did not file a notice of appeal. TEX.R.APP.P. 25.1(c) provides that "[t]he

---

**13.** Mailmasters asserted that Landon's purchase of the inserter in his individual capacity and subsequent lease of same to the company constituted the usurpation of a corporate opportunity. The trial court denied Mailmasters' claim in this regard which Mailmasters does not appeal.

appellate court may not grant a party who does not file a notice of appeal more favorable relief than did the trial court except for just cause." This appellate issue appears in the appellees' brief filed in this matter by S & H and DMI in response to Landon's appellant's brief.[14] The appellate issue is referred to as a "cross-issue." However, the issue seeks affirmative relief by requesting the award of $9,112.00 in connection with a payment it purportedly made with respect to the inserter. Mailmasters argues that it should be permitted to assert this appellate issue on the basis that Landon did not list Mailmasters as an appellee on the docketing statement which he filed in this cause. We disagree with Mailmasters' reasoning. Mailmasters' omission from Landon's docketing statement would only justify permitting Mailmasters to present a defensive matter to an appellate complaint made by Landon. The appellate issue which Mailmasters attempts to assert is a claim for affirmative relief seeking additional damages other than those awarded by the trial court. Mailmasters knew or should have known of this complaint at the time the trial court entered its judgment. We, therefore, decline Mailmasters' request to address its appellate issue.

### Conclusion

The trial court's judgment on S & H and DMI's claims concerning bonuses paid to Landon is affirmed. With respect to the Grand Prairie Property, the trial court's determination that the terms of the real estate lien note were modified is reversed and rendered in favor of DMI. The issue of the damages which DMI is entitled to recover for Landon's breach of the real estate lien note is remanded for determination. The trial court's denial of DMI's claim on the United Medicorp Note is re-versed and remanded for a determination of the damages which DMI is entitled to recover on said claim. The trial court's determination that Landon's acquisition of the Jack Young Note was valid is reversed and rendered in favor of S & H and DMI. DMI's claim for damages regarding the Jack Young Note is remanded for a determination of the amount which Landon paid for the note so that DMI's damages can be calculated. The trial court's determination that DMI is entitled to offsets for Young's notes of $16,000.00 and $20,000.00 is affirmed. The judgment against DMI on Landon's $100,000.00 note is reversed and rendered in DMI's favor. The judgment sustaining the interest rate of 18 percent on Landon's $100,000.00 note is reversed and remanded for determination consistent with this opinion. The trial court's judgment pertaining to Landon's travel expenses, the UCNWINN stock, and Landon's postage claim is affirmed. The trial court's damage award regarding the Phillipsburg Twelve–Station Inserter is modified and affirmed consistent with this opinion.

---

14. Mailmasters' name appears on the cover of the brief.